IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALBERT KIRKMAN, B54397, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 14 C 2398 |
| | ) | |
| MICHAEL MAGANA, Warden, | ) | |
| Stateville Correctional Center, | ) | The Honorable |
| | ) | Thomas M. Durkin, |
| Respondent.[1] | ) | Judge Presiding. |

## ANSWER TO HABEAS PETITION

Pursuant to Habeas Corpus Rule 5 and this Court's May 15, 2018 order, Doc. 40, respondent answers petitioner's 28 U.S.C. § 2254 petition, Doc. 1, and requests that it be denied.

## BACKGROUND

### A.    Petitioner Is Convicted of Murder after Willie Johnson, the Sole Surviving Victim, Identifies Him as One of Two Shooters.

Petitioner and his codefendant Cedric Cal were charged in the Circuit Court of Cook County with the first degree murders of Cedric Herron and Sammy Walker and the attempted murder and aggravated battery with a firearm of Willie Johnson.

At a joint jury trial, Johnson testified that on the date of the shooting, April 21, 1992, he lived with his mother and sister Latanya at 950 North Harding in

---

[1] Petitioner is incarcerated in the Danville Correctional Center, where Victor Calloway is warden. *See* Doc. 41 at 7 n.1. Accordingly, Calloway should be substituted for Michael Magana as the proper respondent. *See* Habeas Rule 2(a) ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

Chicago.   Resp. Exh. B at B41-42.   That afternoon, Latanya came home crying,
and Johnson confronted a neighbor, Keith Ford.   *Id.* at B44-45.   Johnson found
Ford standing outside of his house with five other men, including "Duke."   *Id.* at
B45.   There was a physical altercation between Johnson and the men standing
with Ford.   *Id.* at B46.   Two of Johnson's friends, Herron and Walker, joined in.
*Id.* at B46-47.   Johnson then returned home.   *Id.* at B48.

That night around 10:00 p.m., Johnson was standing in his yard with Herron
and Walker when Duke and a second man approached.   *Id.* at B49-52.   Both were
armed with guns.   *Id.* at B52.   Johnson saw "the motion of pointing a gun," and he
"just laid down and hit the ground."   *Id.* at B51.   Johnson was shot nine times,
and Herron and Walker died of gunshot wounds at the scene.   *Id.* at B56-57, B132.

Detective Michael Miller testified that he first spoke to Johnson in the
emergency room while Johnson was being prepared for surgery.   *Id.* at B131-34.
Johnson described the two shooters, identified one of them as Duke, and gave
details about Duke's house and car to assist Miller in identifying him.   *Id.* at B58-
60, B134-35.   A few hours later, petitioner and Cal were apprehended, and Miller
returned to the hospital to show Johnson their photographs.   *Id.* at B138, B169.
Johnson identified petitioner and Cal as the shooters, noting that petitioner was the
person he knew as Duke.   *Id.* at B60-61, B139-40.

At trial, Johnson again identified petitioner and Cal as the shooters, *id.* at
B62-63, and they were convicted of all charges, *see* Resp. Exh. C at C85-86.   The

appellate court affirmed petitioner's convictions, Resp. Exh. I, and the Illinois Supreme Court denied leave to appeal, Resp. Exh. K. Ultimately, petitioner was sentenced to sixty years in prison. *See* Resp. Exh. A.

**B. The State Courts Deem Johnson's Recantation of His Trial Testimony Incredible and Reject Petitioner's Claim of Innocence.**

In 2009, petitioner moved for leave to file a successive postconviction petition claiming innocence. Resp. Exh. KK.[2] He tendered an affidavit from Willie Johnson, signed in 2009, recanting his 1994 testimony identifying petitioner and Cal as the shooters and blaming Keith Ford and an unknown accomplice. *See id.* at C92-99. Johnson claimed that he did not tell police about Ford's involvement because he "wanted to take care of it in the streets" and retaliate against Ford "for killing [Johnson's] best friend [Herron]." *Id.* at C96.

In his affidavit, Johnson asserted that Ford "was a Regent for the Gangster Disciples" who "ran the drug trade on North Harding." *Id.* at C93. Both Johnson and Herron were members of a rival gang (the Insane Vice Lords), and they also sold drugs on the street. *Id.* at C92-93. Petitioner lived down the block and was known to Johnson as a Conservative Vice Lord. *Id.* at C92. The day before the shooting, Johnson found petitioner and Cal selling drugs in front of his house and confronted them, robbing them of their drugs and money. *Id.* at C92. Johnson's sister Latanya and girlfriend Latrese Buford witnessed the altercation and the next

---

[2] This proposed filing constituted petitioner's fourth postconviction petition. The first three petitions raised no issue relevant here. *See* Resp. Exhs. L, U, & CC.

night told police that petitioner and Cal were the likely shooters. *Id.* at C92, C95. Johnson "just rolled with it" and identified petitioner and Cal because he "was still pissed that they were taking over [his drug] spot" and wanted to "get[ ] back at them." *Id.* at C96.

The trial court granted leave to file the successive petition, Resp. Exh. LL at B6-7, and held an evidentiary hearing at which Johnson, Buford, and Lillian Rivera testified, *see id.* at M1-M85, Q1-Q125, R1-R45.

Johnson testified that after a police officer at the hospital showed him photographs of petitioner and Cal, he identified them as the shooters because he "didn't like them." *Id.* at M32-M33. When asked why he did not name Ford as the real perpetrator, Johnson said, "my mother had already started receiving silent calls and guys was following my mother around and my sister was being threatened," and he claimed that "the things I said I said out of fear, you know, for my life as well as my sister's and my mother." *Id.* at M33. When asked to elaborate further, Johnson claimed to have received a phone call while in the emergency room from "somebody that was already in the penitentiary." *Id.* at M75.

Before signing his 2009 affidavit, Johnson spoke by telephone with Ray Ray Longstreet, a "very high ranking" Vice Lord who had the authority to tell Johnson what to do until Johnson "retired" from the gang sometime earlier. *Id.* at M79-M82. Longstreet "gave [Johnson] the green light" to recant his trial testimony,

telling him that "he had [Johnson's] back." *Id.* at M79. Johnson testified that Longstreet's phone call was "the only reason, Judge, I'm here." *Id.*

Buford testified at the hearing that she told detectives that she heard gunshots, but that she "[d]idn't know anything" else. *Id.* at Q34-36. Johnson told her that "Duke and Cal" were the shooters. *Id.* at Q40-41.

Lillian Rivera testified that Ford visited her on the night of the shooting around 9:30 p.m., staying for an hour. *Id.* at Q83-84. Ford was accompanied by a second person, who was neither petitioner nor Kirkman. *Id.*

The trial judge deemed Johnson's recantation incredible for several reasons and denied relief. *Id.* at S10. Because Johnson's identification of petitioner at the hospital amounted to a dying declaration, it was highly credible; his recantation, by contrast, was "internally inconsistent and implausible." *Id.* at S6-7. First, Johnson gave contradictory explanations why he concealed Ford's alleged involvement: he claimed in his affidavit that he had wanted to retaliate against Ford without involving law enforcement, but then testified at the hearing that he was afraid of Ford after receiving a phone call from somebody in prison. *Id.* at S6-S7. Second, the judge assessed Johnson's credibility against his affiliation with the Vice Lords street gang.[3] Johnson claimed that he was testifying only after talking to Ray Ray Longstreet, a Vice Lords leader. *Id.* at S8. Johnson testified that at

---

[3] Contrary to petitioner's claim, the trial judge did not discount Johnson's credibility solely because he was a gang member. *See* Doc. 41 at 35-36. Instead, the judge considered how Johnson's history as a Vice Lord gave him a motive to recant.

one point he was a member of the Vice Lords, petitioner was also a Vice Lord, and Keith Ford was a member of a rival gang. *Id.* at S8-S9. It was thus reasonable to conclude that Johnson's "alliance" with and "loyalty" to the Vice Lords motivated him to exculpate petitioner and Cal and to implicate the rival Ford. *Id.* at S8. Because Johnson's recantation was not credible, the trial court held that petitioner had failed to demonstrate that he was innocent. *Id.* at S10.

Petitioner appealed, raising two issues: (1) Johnson's recantation was true and proved petitioner's innocence; and (2) even if the recantation was false, due process required a new trial. *See* Resp. Exh. MM. The appellate court affirmed, finding that the trial judge's rejection of Johnson's recantation was not manifestly erroneous, *see* Resp. Exh. PP at 10-11, and that this credibility determination defeated petitioner's claims, *see id.* at 13-17. The Illinois Supreme Court denied petitioner's ensuing petition for leave to appeal. *See* Resp. Exh. SS.

## C.   Petitioner Seeks Habeas Relief Based on Johnson's Discredited Recantation.

Petitioner filed a federal habeas petition in 2014, Doc. 1, and a supplemental memorandum in 2018, Doc. 41. The petition alleges that:

(1)   petitioner was denied due process because "he was convicted of a crime without sufficient evidence";

(2)   petitioner was denied due process because "the only evidence presented at trial that implicated him in the crime was perjured testimony" from Johnson, "regardless of whether the State knew that Mr. Johnson was lying at the time of trial"; and

(3)　petitioner "is actually innocent . . . such that failure of this Court to review his claims would result in a fundamental miscarriage of justice."

Doc. 1 at 8, 10-11.[4]　The memorandum adds (4) a standalone claim of innocence, Doc. 41 at 45-49; and (5) a claim that due process requires a new trial in light of Johnson's recantation, even if that recantation is false, Doc. 41 at 38-41.[5] Petitioner's claims are timely-filed.

## ARGUMENT

### I.　Petitioner's Claims of Trial Error Are Procedurally Defaulted and Meritless.

Petitioner's claims of trial error premised on Johnson's recantation are both procedurally defaulted and meritless.　First, Johnson's recantation does not render the evidence insufficient; it has no bearing on the inquiry under *Jackson v. Virginia*, 443 U.S. 307 (1979), and, even if it did, a rational juror could credit Johnson's testimony over his recantation.　Second, the prosecutor's reliance on Johnson's testimony did not violate due process because Johnson's testimony was not false, and, at the very least, the State was not aware of its alleged falsity at the time of trial.

---

[4] The petition also raised a claim under *Miller v. Alabama*, 567 U.S. 460 (2012), *see* Doc. 1 at 10, that petitioner has since withdrawn, Doc. 41 at 50 n.3.

[5] Citations to documents filed in the CM/ECF system refer to the page numbers assigned by CM/ECF.

## A.    The Evidence Was Sufficient.

Petitioner claims that his conviction violates *Jackson* because Johnson recanted his testimony.    *See* Doc. 41 at 26-30.    But *Jackson* asks whether the *trial evidence* sufficed for a rational juror to convict, and Johnson's recantation has no bearing on that analysis.    *See Herrera v. Collins*, 506 U.S. 390, 402 (1993) ("the sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence,'" and "does not extend to nonrecord evidence, including newly discovered evidence") (quoting *Jackson*, 443 U.S. at 318).

Petitioner's misapprehension of *Jackson* leads him to contend, mistakenly, that he raised (and the state courts adjudicated) a *Jackson* claim in his most recent successive postconviction proceeding.    Petitioner did not raise a *Jackson* claim in the state trial court.    His successive postconviction petition asserted that petitioner's convictions "violate the right to due process of law because newly discovered evidence proves his innocence" and cited only cases addressing a claim of innocence under the Illinois constitution.    Resp. Exh. KK at C68 (capitalization removed).    Petitioner's appellate brief raised, in addition to innocence, a different due process claim, arguing that a new trial is required whenever a sole eyewitness recants his testimony.    *See* Resp. Exh. MM at 50-53.    The relief that petitioner requested — a new trial — establishes that he was not raising a sufficiency claim, because prevailing on a *Jackson* claim "bars a retrial."    *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

Petitioner's failure to squarely raise a *Jackson* claim in state court procedurally defaulted it for purposes of habeas review. *See McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) ("[t]o avoid a procedural default, a habeas petitioner must 'fairly present' a claim to each level of the state courts," articulating "[b]oth the operative facts and controlling law"). Petitioner argues that this Court should excuse any procedural default because he is innocent. Doc. 41 at 42-45. This demanding standard would require him to show that "it is more likely than not that no reasonable juror would have convicted" him in light of Johnson's recantation. *See Schlup v. Delo*, 513 U.S. 298, 237 (1995). But triers of fact need not accept recantations. *See, e.g.*, *United States v. Griffin*, 84 F.3d 912, 929-30 (7th Cir. 1996) (district court did not err in disbelieving recantation and rejecting claim that witness's trial testimony was false). Notwithstanding Johnson's belated recantation, a rational factfinder could convict petitioner based on Johnson's trial testimony and out-of-court identifications of petitioner.

Default aside, petitioner's *Jackson* claim fails.[6] *Jackson* instructs courts to "view[ ] the evidence in the light most favorable to the prosecution" to determine

---

[6] Petitioner's presentation of his *Jackson* claim through the lens of § 2254(d), *see* Doc. 41 at 21-32, rests on the mistaken premise that he raised a *Jackson* claim in state court. If he had, this Court would presume that the state court adjudicated it on the merits, but petitioner's failure to fairly present a *Jackson* claim means that it could not have been adjudicated. *See Johnson v. Williams*, 568 U.S. 289, 301-02 & n.3 (2013). If a federal court excuses a procedural default, it reviews the merits of an unadjudicated claim de novo. *Tabb v. Christianson*, 855 F.3d 757, 765 (7th Cir. 2017).

"whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. Johnson's identification of petitioner was sufficient for a rational juror to convict him. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."); *see also Foxworth v. St. Amand*, 570 F.3d 414, 426 (1st Cir. 2009) (reversing habeas relief on sufficiency claim because "a criminal conviction can rest on the testimony of a single eyewitness" even if it "is uncorroborated and comes from an individual of dubious veracity").

Indeed, the State's evidence sufficed even taking Johnson's recantation into account. Petitioner's claim that "there is no longer a single shred of evidence implicating [petitioner] in these crimes," Doc. 41 at 26, is mistaken. Johnson's initial identification of petitioner from his hospital bed — a highly reliable dying declaration, *see* discussion *infra* at pp. 16-17 — is evidence of petitioner's guilt, as is Johnson's trial testimony reiterating that identification. Johnson's recantation merely undercuts the credibility of the State's evidence; it does not negate the State's case. Viewing the evidence in the light most favorable to the State, as *Jackson* commands, a rational factfinder could credit Johnson's early, reliable identification and trial testimony over his belated recantation.

## B.    The State's Reliance on Johnson's Testimony Did Not Violate the Constitution.

Petitioner suggests that the State's reliance on Johnson's trial testimony violated due process because Johnson's testimony was false.    *See* Doc. 1 at 10. Petitioner failed to raise this claim in his most recent state postconviction proceeding based on Johnson's recantation.    Accordingly, it is defaulted, and petitioner cannot show innocence to overcome his default.

This claim also lacks merit.    First, contrary to petitioner's claim, Johnson's testimony was not false.    The state court's determination that Johnson's trial testimony was true (and his recantation was false) is presumed to be correct.    28 U.S.C. § 2254(e)(1); *Rever v. Acevedo*, 590 F.3d 533, 537 (7th Cir. 2010) (state court's factual determination is presumed correct regardless of whether state court adjudicated legal claim at issue); *United States ex rel. Washington v. Page,* 981 F. Supp. 1097, 1099-1100 (N.D. Ill. 1997) (denying claim under § 2254(e)(1) because habeas petitioner failed to rebut state court's factual determination that witness was not lying).    Petitioner must overcome that presumption with clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and he has failed to do so, *see infra* Section III.A.

Second, to state a due process violation, a prosecutor must be aware of the alleged falsity at the time of trial.    *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment");

*Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001) ("[w]hen the defendant argues that the government allegedly used perjured testimony, to warrant setting the verdict aside and ordering a new trial, the defendant must establish," among other things, that "the prosecution knew or should have known of the perjury"). Petitioner does not assert that the prosecutor had such knowledge. And Johnson's testimony at the evidentiary hearing should remove any doubt: Johnson testified that he readily identified petitioner and Cal as the shooters without any pressure by police, and he stood by those identifications until 2009. Consequently, the prosecutor's reliance on Johnson's testimony was appropriate, even if petitioner could show that the testimony was false.

## II. Petitioner's Claims Premised on New Evidence of Innocence Are Not Cognizable under the Federal Constitution.

Petitioner's primary contention is that his conviction (which followed a fair trial) has become unconstitutional due to Johnson's recantation.

Habeas relief is available "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A claim of innocence based on new evidence is not cognizable under the federal constitution. *See Herrera v. Collins*, 506 U.S. 390, 416 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Gladney v. Pollard*, 799

F.3d 889, 895 (7th Cir. 2015) ("The Supreme Court has not recognized a petitioner's right to habeas relief based on a stand-alone claim of actual innocence.").

As the Supreme Court reasoned in *Herrera*, "the trial is the paramount event for determining the guilt of innocence of the defendant," and "[f]ederal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings." *Herrera*, 506 U.S. at 416. *Herrera* allowed for the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417. Those circumstances are not present here: this is not a capital case, and petitioner's innocence claim based on Johnson's recantation was fully litigated in state court, where he raised the claim under the Illinois constitution, *see People v. Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996).

Although petitioner purports to raise two claims, *Herrera* bars both. First, petitioner claims that he is innocent because Johnson's recantation of his trial testimony was credible. *Herrera* expressly considered, and declined to find cognizable under the federal constitution, such a claim of actual innocence. Second, petitioner contends that even if Johnson's recantation were *false*, his conviction is nevertheless unconstitutional because Johnson's recantation shows retrospectively that he is an unreliable witness. *See* Doc. 41 at 38-41. Petitioner

cannot avoid that he seeks to invalidate a conviction that was constitutional at the time it was rendered based entirely on new evidence — the exercise that *Herrera* prohibits. Moreover, this variation on petitioner's claim, premised on a *false* recantation, is not the kind of "truly compelling" showing of innocence that might satisfy *Herrera*.

In sum, petitioner's innocence claims premised on new evidence are not cognizable under § 2254(a). At the very least, habeas relief is precluded by *Teague v. Lane*, 489 U.S. 288, 310 (1989), which bars retroactive application of new rules on collateral review. A rule is "new" if it was not dictated by precedent at the time petitioner's convictions became final. *Beard v. Banks*, 542 U.S. 406, 413-16 (2004). Because the Supreme Court has not held that innocence claims premised on new evidence are cognizable under the federal constitution, *see McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."), granting relief on such a theory would require adoption of a new rule. And petitioner's alternative claim that Johnson's recantation renders his convictions unconstitutional even it is false fares even worse under *Teague*, because the Court has never even suggested that such a claim might be permissible.

III.   **Petitioner's Claims Are Barred by 28 U.S.C. § 2254(d).**

*Herrera* and *Teague* aside, petitioner's due process claims fail because the state courts adjudicated them on the merits, and petitioner cannot satisfy 28 U.S.C. § 2254(d).

A.   **Petitioner's Innocence Claim Must Fail Because He Has Not Shown by Clear and Convincing Evidence that Johnson's Recantation Must Be Credited.**

The Illinois Appellate Court adjudicated petitioner's innocence claim on the merits.   *See* Resp. Exh. GG at 11; *see also Johnson*, 568 U.S. at 301.   Thus, to obtain habeas relief, petitioner must show that its adjudication involved either an unreasonable application of clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1); or an unreasonable determination of fact, 28 U.S.C. § 2254(d)(2).   He can show neither.

First, petitioner cannot satisfy § 2254(d)(1).   The "starting point" for that analysis "is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)).   As discussed, the Supreme Court has never held that a claim of innocence is cognizable under the federal constitution, and its express recognition that this question remains open, *see McQuiggin*, 569 U.S. at 392, demonstrates that the principle is not "clearly established" for purposes of § 2254(d)(1), *Howes v. Fields*, 565 U.S. 499, 505 (2012).

Nor can petitioner satisfy § 2254(d)(2). The state court's determination that Johnson's recantation was not credible is presumed correct, and petitioner must rebut it with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012) ("[s]tate court findings, including credibility determinations, are presumed correct on federal habeas review"). Because petitioner has failed to meet that burden, the state court's adjudication cannot be deemed unreasonable for purposes of § 2254(d)(2). *See Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011).

Although § 2254(e)(1) places the issue of Johnson's credibility beyond debate, the trial court correctly, and at least reasonably, determined that his recantation was not believable. Johnson's initial identifications of petitioner and Cal were highly credible under the circumstances. Johnson had been shot nine times and was awaiting surgery when Detective Miller first interviewed him in the emergency room. Johnson testified at the evidentiary hearing that he "thought [he was] going to die," Resp. Exh. LL at L48, and courts have long recognized that such "dying declarations" — in which critically wounded victims explain the causes of their injuries — are unusually reliable, because "persons making such statements are highly unlikely to lie." *Idaho v. Wright*, 497 U.S. 805, 820 (1990); *see also Mattox v. United States*, 156 U.S. 237, 244 (1895) ("[T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath."). Johnson immediately

identified petitioner and Cal from his hospital bed, then identified both men again at trial.

On the other hand, courts view recantations skeptically. *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) ("Disbelief of recantations is sensible."); Resp. Exh. GG ("Recanted testimony is generally 'regarded as inherently unreliable[.]'") (quoting *People v. Morgan*, 817 N.E.2d 524, 528 (Ill. 2004)). And Johnson's recantation is especially "suspect" because it was "produced . . . at the 11th hour with no reasonable explanation for the . . . delay." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013) (referring to such belated affidavits as "inherently suspect").

Moreover, Johnson's testimony was implausible and contradictory. Contrary to his trial testimony and that of Detective Miller, he testified at the postconviction hearing that police immediately showed him photographs of petitioner and Cal, allegedly because Buford and Latanya told police that petitioner and Cal were the shooters, and that he just "went along with it" when presented with their photographs. But Buford contradicted this account, denying that she had identified anyone, and stating that Johnson had told *her* that the perpetrators were "Duke and Cal." Furthermore, the chronology of events described in Johnson's recantation makes no sense. For the photo identifications to have taken place immediately after the shooting, as Johnson claimed at the hearing, Detective Miller would have needed to interview Buford and Latanya (neither of whom witnessed

the shooting), before visiting the police station and hunting down photographs — all before going to the hospital to interview Johnson, the sole eyewitness who suffered nine gunshot wounds. The more likely sequence of events was related by Detective Miller and Johnson at trial: (1) shortly after the shooting, Miller rushed to the hospital to interview Johnson; (2) Johnson immediately named "Duke" as one of the shooters; (3) Detective Miller obtained photographs of petitioner and Cal based on that information and returned to the hospital; and (4) Johnson confirmed the identifications. *See* Resp. Exh. B at B58-62, B131-38.

Johnson's explanations *why* he hid Ford's guilt and falsely blamed petitioner and Cal are equally flawed. Johnson claimed at the evidentiary hearing that he was afraid of Ford, but he asserted that in his 2009 affidavit that he hid Ford's involvement because he intended to retaliate. Similarly, Johnson's explanation for his willingness to falsely identify petitioner and Cal is unpersuasive. Johnson claimed that he was angry at petitioner and Cal because he found them selling drugs in front of Johnson's house the day before the shooting. According to Johnson, he confronted petitioner and Cal and robbed them. This altercation provided both men with an obvious motive for attacking Johnson and his friends the next day; it provides a less convincing rationale for Johnson to falsely implicate the men in two murders.

Furthermore, the gang affiliations of Johnson, Herron, petitioner, and Ford (as described by Johnson) support the reliability of Johnson's early identifications

and undercut his recantation. Petitioner insists, falsely, that "[t]here is no evidence that [he] and Cal were affiliated with any gang." Doc. 41 at 33. Johnson, in his affidavit and hearing testimony (which petitioner claims this Court must credit), testified that at the time of the shooting, petitioner was a Conservative Vice Lord, Johnson and Herron were affiliated with the Insane Vice Lords, and Ford was a high-ranking member of the rival Gangster Disciples. These details concerning gang affiliations were not incidental or insignificant: Johnson explained that he was motivated to falsely implicate petitioner in part because he was unhappy that petitioner (a Vice Lord) was cooperating with Ford (a rival). The state courts were appropriately skeptical of Johnson's claim that he was willing to falsely implicate fellow Vice Lords and conceal the guilt of a gang rival.

On the other hand, the purported gang affiliations do explain Johnson's willingness to recant. Johnson testified that his "only reason" for testifying was a telephone conversation with Longstreet, a high-ranking Vice Lord. Although Johnson claimed that this phone call was significant because Longstreet promised to protect him against Ford, Johnson was living out of state, where Longstreet could do little to protect him. It is more plausible that Longstreet urged Johnson to assist fellow Vice Lords who had been sentenced to life in prison, and Longstreet's high rank in the gang gave him the authority to order Johnson to do so.

Petitioner insists that the trial judge was obligated to credit Johnson's testimony that he was motivated instead by a desire to tell the truth. *See* Doc. 41

at 32-33.   But a trial court need not accept implausible testimony, and Johnson's claim was undercut by his failure to come forward to exculpate petitioner and Cal, even long after he had moved from Chicago and had no plausible reason to fear retaliation from Ford.   Johnson testified that a short phone conversation with Longstreet was "the only reason" he was willing to recant, but did not explain his failure to make such a phone call and recant his allegedly false testimony at any point before 2009.

Finally, petitioner emphasizes that Johnson's recantation "is the epitome of a statement against interest" because "it exposed him to a perjury conviction."   Doc. 41 at 37.   Although true, the appellate court reasonably concluded that Johnson was willing to take that risk to help fellow Vice Lords.

In sum, Johnson's trial testimony was more credible than his recantation, but this Court need not decide whether it would reach that conclusion in the first instance.   At a minimum, the state court's decision to credit Johnson's trial testimony over his recantation was not unreasonable, and habeas relief should be denied.

### B.    The Supreme Court Has Not Clearly Established That a False Recantation Entitles a Defendant to a New Trial.

Section 2254(d) also bars habeas relief on petitioner's claim that due process requires a new trial even if Johnson's recantation is false.   *See* Doc. 41 at 38-41. Petitioner argues at length that he satisfies § 2254(d) because the state court unreasonably applied *Jackson*, Doc. 41 at 26-38, but as discussed, petitioner did not

raise a *Jackson* claim, *see supra* Section I.A. Instead, he raised the novel claim that a false recantation entitles him to a new trial. *See* Resp. Exhs. MM & OO. That is the claim that the state court adjudicated when it held that petitioner's "due process argument cannot be sustained," Resp. Exh. PP at 16-17; *Johnson*, 568 U.S. at 301, and the claim for which petitioner must overcome § 2254(d).

Because this claim accepts the state court's factual determination that Johnson's recantation was false, petitioner does not satisfy § 2254(d)(2). Nor can petitioner satisfy § 2254(d)(1). The Supreme Court has never "clearly established" that recantations, or any other type of newly discovered evidence, mandate a new trial. *See Marshall*, 569 U.S. at 61 ("starting point" for § 2254(d)(1) is to identify pertinent clearly established precedent). Petitioner attempts to distill such a rule from a disparate array of Supreme Court cases, citing precedents pertaining to the sufficiency of evidence, the admissibility of identifications premised on suggestive procedures, and the State's knowing presentation of false testimony and failure to disclose exculpatory evidence. *See* Doc. 41 at 39. Such extrapolation, however, is unavailing on habeas review: "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). The fact that petitioner's cited cases stray so far from the mark underscores that he

attempting to extend them far beyond their holdings.   Therefore, petitioner's claim should fail.

## IV.   This Court Should Deny a Certificate of Appealability.

Upon denying the petition, this Court should deny a certificate of appealability (COA).   *See* Habeas Rule 11(a); *Gonzalez v. Thaler*, 565 U.S. 134, 143 n.5 (2012).   A COA is warranted only if petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), meaning that "jurists of reason would find it debatable whether the petition states a valid claim," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added), and whether the court's procedural ruling was reasonable.   It is not debatable that petitioner's claims are procedurally, meritless, and/or not cognizable.

## CONCLUSION

This Court should deny petitioner's petition for a writ of habeas corpus and deny a certificate of appealability.

July 31, 2018

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:  /s/ Erin M. O'Connell
ERIN M. O'CONNELL, Bar #6283650
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-1235
FAX: (312) 814-2253
EMAIL: eoconnell@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 31, 2018, I electronically filed respondent's **Answer to Habeas Petition** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which will automatically serve notice on the following CM/ECF-users: Jonathan Loevy, Gayle Horn, and Tara Thompson, counsel for petitioner Albert Kirkman.

/s/ Erin M. O'Connell
ERIN M. O'CONNELL, Bar #6283650
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-1235
FAX: (312) 814-2253
EMAIL: eoconnell@atg.state.il.us