# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ALBERT KIRKMAN, B54397 | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 14-cv-2398 |
| v. | ) | |
| | ) | |
| VICTOR CALLOWAY, Warden, | ) | Judge Thomas M. Durkin |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Albert Kirkman filed this petition for relief under 28 U.S.C. § 2254, claiming that the prosecution's main witness during his trial has recanted his testimony. For the following reasons, Kirkman's petition is denied.

## Background[1]

### A. Trial

On April 21, 1992, Willie Johnson, Cedric Herron, and Sammie Walker were shot. Herron and Walker were killed, and Johnson was seriously injured. The prosecution's sole witness to the events was Johnson.

At trial, Johnson testified that on April 21, 1992, he got into a fight with five

---

[1] The following background is largely taken from the state appellate court's statement of facts. *See People v. Kirkman*, 2013 IL App (1st) 112362-U. In federal habeas corpus proceedings, the Court accepts as true the factual findings of state courts unless they are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *Tabb v. Christianson*, 855 F.3d 757, 760 (7th Cir.), *cert. denied sub nom. Tabb v. Garnett*, 138 S. Ct. 365 (2017). The Court has also supplemented the facts from undisputed evidence in the record where necessary.

men, including Kirkman, at the home of Keith Ford. Johnson testified that the fight concerned a matter involving his sister, Latanya Johnson. Johnson's two friends, Herron and Walker, arrived at the scene and helped him fight off the individuals attacking him. Johnson testified that later that night, he was talking to Herron and Walker outside of his home when two men approached and shot at them. One of the men was a man Johnson knew as "Duke," and identified as Kirkman. While lying on the ground, Johnson looked back and saw Kirkman's face and another man's face.

Johnson testified that while he was being treated at the hospital, he told detectives what happened, described the two shooters, and told them generally where Duke lived, what car he drove and that he hung around with Ford. Later that day, detectives returned, and Johnson picked out photos of Duke and the other shooter from an array of photos. Johnson then was asked whether the men he identified from the photos were in court. He identified Kirkman as the man he knew as Duke, and Cedric Cal as the other shooter whose name he did not know. Johnson also identified Kirkman and Cal as two of the men who had been involved in the fight that stemmed from the confrontation with Ford.

On cross-examination, Johnson denied that the fight involved Herron's drug sales on Ford's "turf." Johnson maintained that the fight had started when Johnson confronted Ford about his sister. He denied seeing the police speak to his girlfriend, Latrese Buford, or his sister, Latanya, at the hospital.

Detective Mike Miller testified about the police investigation, including his interactions with Johnson and his identification of the shooters through photographs.

Miller explained that he and his partner went to the hospital where they interviewed Johnson in the emergency room while he was being prepared for surgery. Johnson provided a description of the shooters, identified one by his nickname "Duke," and provided a description of the car that had been used. Miller then learned of an arrest that had occurred around the same time and in the same area as the shooting where eight people were arrested at Keith Ford's house. Miller took photos of the arrestees to Johnson to see if Johnson would identify any as the shooters, but Johnson did not.

Officer John Nee testified that around 1:15 a.m., Nee pulled over a car that matched the description he had for the car identified by Johnson and arrested both Kirkman, who was driving, and Cal, who was in the car and matched the general description of the second shooter. When questioned by Nee about his identity, Kirkman identified himself as Albert Kirkman, denied he had a street name, but stated he "had a tattoo of Duke on his left arm." Miller further testified that after this arrest, photos were taken of Kirkman and Cal, included in a second photo array, and shown to Johnson in the hospital where he identified them as the shooters.

Johnson's girlfriend at the time of the shooting, Latrese Buford, testified for the defense. Buford testified that on April 21, 1992, she was with Johnson when she witnessed an altercation between Herron and Ford's friends over a drug sale. Ford and Herron, who were present but not in the fight, began to argue, and Herron told Ford to "get them off my worker." Ford told his friends to stop, and they did as Ford and Herron continued to talk. Buford testified that, after the fight, Ford approached Johnson, informing him that it could be dangerous being around Herron because

Herron was selling drugs on Ford's turf. Buford and Johnson then went to Johnson's home. Buford testified that sometime after 10 p.m., Herron and Walker arrived at Johnson's home, and Johnson stepped outside to talk with them. Buford was inside the home when she heard gunshots.

Upon this evidence, the jury found Kirkman guilty of murder and aggravated battery with a firearm. Kirkman was sentenced to life in prison without parole.

## B. Post-Conviction Proceedings

Kirkman unsuccessfully filed a direct appeal and three post-conviction petitions. Those proceedings are not relevant here. Kirkman then filed a motion for leave to file a successive post-conviction petition. Kirkman claimed he was entitled to a new trial because Johnson recanted his original trial testimony in which he identified Kirkman and his co-defendant, Cedric Cal, as the shooters. Johnson had submitted an affidavit in which he identified Keith Ford and another unidentified man as the shooters. In his affidavit, Johnson asserted that Ford "was a Regent for the Gangster Disciples" who "ran the drug trade on North Harding." Both Johnson and Herron were members of a rival gang (the Insane Vice Lords), and they also sold drugs on the street. Kirkman lived down the block and was known to Johnson as a Conservative Vice Lord. The day before the shooting, Johnson found Kirkman and Cal selling drugs in front of his house and confronted them, robbing them of their drugs and money. Johnson's sister Latanya and girlfriend Latrese Buford witnessed the altercation. After the shooting, they told police that Kirkman and Cal were the likely shooters. Johnson "just rolled with it" and identified Kirkman and Cal because

he "was still pissed that they were taking over [his drug] spot" and wanted to "get[ ] back at them." Without objection from the State, the circuit court advanced Kirkman's petition to the third stage of postconviction proceedings and conducted an evidentiary hearing on various dates in 2011.

At Kirkman's postconviction evidentiary hearing, Johnson testified that his affidavit was true. He also testified that he knew Kirkman and Cal from living on the same block, and that he considered them enemies because they sold drugs at the same spot as him. Johnson denied ever fighting with Kirkman, but he admitted that, on one occasion in April 1992, Johnson walked up to Kirkman and Cal and "took their merchandise," which he indicated was crack cocaine. That was their only dispute, and they had never been in a fight related to Johnson's sister.

Johnson also testified that on the night of the shooting, he was outside talking with Herron and Walker when two men with guns arrived and began shooting. He identified Ford as one of the shooters and recognized the other man, but he did not know that man's name; however, he testified that he knew the man was not Kirkman nor Cal.

Johnson further testified that he falsely identified Cal and Kirkman as the shooters because he was afraid of Ford and because his family had received threatening calls, which he believed came from Ford. Johnson stated that he never gave the police Ford's name because he "feared to even use his name" and wanted to "take care of it in the streets." When the police returned with the photo lineup, Johnson explained that he again identified Cal and Kirkman because Ford was

"adamant about what he would do to [his] people if [he] implicated [Ford] in any way, type of way, shape, form or fashion." On cross-examination, Johnson explained that he heard Latanya and Buford tell the police at the hospital that Cal and Kirkman were the shooters, so he agreed with them. He explained that "when [his] sister and [Buford] pointed these guys out [,] it was just convenient," because he felt like he was protecting his family. He also admitted that he did not come forward in the 17 years since Kirkman's trial until he was contacted by Kirkman's lawyers in 2009.

The court then questioned Johnson. Regarding when he heard Latanya and Buford provide police with Kirkman's name, Johnson testified that he heard this while he was still on the floor of his mother's home after the shooting. Regarding the threatening phone calls, Johnson testified that his mother and sister told him they had already received calls while he was in the emergency room. Johnson then testified that he received a call while in the emergency room from someone in the penitentiary named "Bo Dilly." Regarding why Johnson was no longer afraid of Ford, Johnson testified that he spoke to Ray Longstreet, a high-ranking Vice Lord, who told him that he had nothing to worry about and to "[j]ust get up there and do the right thing." He understood Longstreet to be advising him to tell the truth and that he would be protected if he did so. Johnson's conversation with Longstreet lasted "probably not even a minute." Johnson testified that Longstreet was a high-ranking member of the Vice Lords; and that he, Kirkman and Cal were also members of the Vice Lords, although he claimed that he was "retired" from the organization. After speaking to Longstreet, Johnson signed an affidavit that defense counsel had

prepared. Johnson also testified that he felt safer coming forward now that he lived in Texas.

At the postconviction hearing, Buford recalled that she did not see either of the shooters. She also stated that while they were in the emergency room, Johnson told her that Cal and Kirkman were the shooters but told her not to tell anyone. She testified that she gave police this information in the car when the detectives took her home from the hospital. However, Buford denied telling the police that Kirkman or Cal were the shooters while in the emergency room. She also denied hearing Latanya provide that information to the police while in the emergency room. Buford claimed that she did not see Johnson make or receive any phone calls in the emergency room and testified that there were no phones present in the emergency room, but that there was a phone in Johnson's hospital room.

State's Attorney Investigator Joanne Ryan testified that on April 6, 2010, she interviewed Johnson in Monroe, Louisiana. Johnson told her that on the day of the shooting, he slammed Kirkman to the ground and stole his drugs. Johnson further told her that later that day, there was a physical altercation between Ford's gang and other drug dealers doing business nearby. Johnson told Ryan that Ford was one of the shooters, but that he did not get a good look at the second shooter. He admitted to Ryan that he could not identify the second shooter and could not exclude Kirkman as the possible second shooter. Johnson also said that he never told the defense investigator that he was certain that the second shooter was neither Kirkman nor Cal.

On July 15, 2011, the circuit court denied Kirkman's petition, finding that Johnson's recantation lacked credibility. The court found that in his new testimony, Johnson gave conflicting accounts of when he heard Latanya and Buford identify Kirkman to the police and how many shooters there were. The court further noted that Johnson testified that he and his family members were receiving calls in the emergency room, which Buford testified had no phone. The court also found Johnson's identification of the shooters at the hospital to be more credible than his explanation that he falsely identified Kirkman so that he could handle Ford on the street. Further, the circuit court determined that Johnson came forward for no reason other than his loyalty to the Vice Lords. Additionally, the court found that Johnson seemed more concerned about satisfying a gang acquaintance, Ray Longstreet, than he was about justice and that he did not seem concerned about the criminal penalties associated with perjury. In conclusion, the circuit court found that the "number of shooters, number of cartridges found at the scene, the testimony concerning the placement of the shooters, all convinced [him] that the other evidence in this case [was] consistent with [Johnson's] testimony" at trial. The court determined that Johnson's recantation was not credible and "[b]ecause it [was] not credible, it [was] not material." The court therefore denied Kirkman's petition.

On appeal, Kirkman argued that the trial court erred in finding Johnson's recantation incredible, that the court improperly excluded material evidence, and that Kirkman's conviction violated his due process rights. R. 46-39 at 1. On June 17, 2013, the Illinois appellate court affirmed the trial court on all grounds, finding that

the trial court's rejection of Johnson's recantation was not "manifestly erroneous." R. 46-42 at 10-11.

The appellate court found that Johnson's testimony was unreliable because it contained "internal inconsistencies and implausible explanations" because of discrepancies between Johnson's testimony and the testimony of another witness about: 1) when the police were given Kirkman and Cal's names; 2) whether there was a telephone in the emergency room where Johnson could receive threatening phone calls; and 3) whether Johnson was afraid of Ford but falsely implicated Kirkman and Cal because Johnson wanted to take care of Ford himself. The appellate court also found that Johnson's "original identification was more believable than his recantation" because Johnson thought he was dying in the emergency room. *Id*. Finally, the appellate court held that Johnson's recantation was motivated not by a desire to tell the truth but by a gang allegiance. Johnson testified that he came forward after a less-than-one-minute phone call with a high-ranking Vice Lord. This was a reasonable conclusion, the appellate court held, because Kirkman, Cal, Longstreet, and Johnson were all members of the Vice Lords. *Id*. at ¶ 20. The appellate court also ruled it was harmless error for the postconviction court to exclude evidence that Kirkman and Cal were not affiliated with any gang. *Id*. at ¶¶ 9-10. Kirkman then filed a petition for leave to appeal to the Illinois Supreme Court. His petition was denied. *People v. Kirkman*, 2 N.E.3d 1048 (2013) (Table).

### C. Johnson's Conviction

Following the evidentiary hearing, the Cook County State's Attorney's Office

prosecuted Johnson for perjury under the theory that he had made contradictory statements in two different portions of these proceedings. *People v. Johnson*, 11-CR-13172; Frank Main, *Murder Witness Recants, is Charged with Perjury*, Chi. Sun Times, September 3, 2011, 2011 WLNR 17458797. Interestingly, that conviction did not specify which of the two statements were false. Johnson ultimately pled guilty and received an agreed sentence of 30 months in prison. *Man Sentenced to Prison for Lying About 1992 Double Slaying*, Chi. Sun Times, October 7, 2014. Several months later, in his last days in office, then-Governor Patrick Quinn commuted Johnson's sentence to time served. *Pardons Play Key Role in Granting Justice*, Chi. Sun Times, June 24, 2016.

### D. Habeas Petition and Johnson's Conviction

Kirkman timely filed this federal habeas petition in 2014, R. 1. The case was stayed while Kirkman pursued one more habeas petition in Illinois state courts based on the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). That petition was successful, and on February 16, 2018, the state *nolle prossed* his aggravated battery conviction and the state court resentenced him to 60 years on both murder convictions to run concurrently.

### Analysis

Kirkman's primary argument here is that his conviction violated his right to due process under the United States Constitution because it was based solely on Johnson's testimony, who is an "inherently unreliable" source. Kirkman contends that Johnson's recantation was credible and thus he offered perjured testimony at

10

the time of the original trial. Along these lines, Kirkman argues that the state court's determination that Johnson's recantation was incredible was based on an unreasonable determination of the facts in violation of 28 U.S.C. § 2254(d)(2). Kirkman further argues that even if Johnson's recantation was incredible, Johnson is nonetheless an unreliable witness, and his conviction should not have been based solely on that testimony. Finally, Kirkman claims that he has a freestanding actual innocence claim. The Court will address each claim in turn.

## A.    Due Process Claim

### 1. Perjured Testimony

The Supreme Court has long held that a conviction obtained using knowingly perjured testimony violates due process. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."); *Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015).

But to establish a due process violation based on perjured testimony, Kirkman would have to show that the state knew it was using perjured testimony. *See Wilson v. Bryant*, 69 F. App'x 782, 784 (7th Cir. 2003) (petitioner's failure to show that testimony was false or that the prosecutor knew of its falsity caused his habeas claim to fail); *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001) ("[w]hen the defendant argues that the government allegedly used perjured testimony, to warrant setting the verdict aside and ordering a new trial, the defendant must establish," among other

things, that "the prosecution knew or should have known of the perjury"). There is no indication that it did here. Nor does Kirkman argue that the state used knowingly perjured testimony. Accordingly, Kirkman's argument that his conviction violates due process because it was based on perjured testimony fails at the outset.

In any event, Kirkman's claim fails because he has not shown that Johnson's testimony was perjured in the first place. To be entitled to habeas relief, a petitioner must show that a state-court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) was "based on an unreasonable determination of the facts in the light of the evidence presented." 28 U.S.C. § 2254(d). *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). Kirkman's argument here focuses on that second prong by arguing that the state court made an unreasonable determination of the facts when it held that Johnson's recantation was not credible and that his original testimony was more believable. A state court decision rests on an unreasonable factual determination when "the state court determined an underlying factual issue against the clear and convincing weight of the evidence." *Morgan,* 662 F.3d at 798. "[S]o long as fair–minded jurists could disagree on the correctness of the state court's decision," the decision is reasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A decision is not objectively unreasonable unless it falls 'well outside the boundaries of permissible differences of opinion.'" *Starkweather v. Smith,* 574 F.3d 399, 402 (7th Cir. 2009) (quoting *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)).

To support his claim on this basis, Kirkman points to several alleged inconsistencies between the record and the state court's factual determinations, including that (1) Johnson's motive for coming forward was because of Ray Longstreet's call; (2) the phone call was made because of his "alliance and loyalty" with a continuing criminal enterprise; (3) Kirkman and Cal were part of that enterprise; and (4) Johnson did not come forward to "see that justice was done."

The crux of all four of these inconsistencies is Kirkman's contention that the trial court's "credibility determination was based on his conclusion that Johnson was only testifying out of gang loyalty." R. 41 at 37. Kirkman points to the state court's refusal to allow testimony that Kirkman and Cal were "neutrons," or unaffiliated neutral persons in the neighborhood. Specifically, Johnson's girlfriend, Latrese Buford, was to testify that the reputation of Cal and Kirkman in the neighborhood was that they were "neutrons" or neutral parties. *See* R. 46-38 at 213-14. The court noted that Buford did not know Kirkman, however. Further, the court found the issue irrelevant because Kirkman and Cal's character had not been placed into issue. *Id*. Kirkman contends the trial court's credibility determination was unreasonable because it did not allow in this evidence, but then focused on the question of gang affiliation "almost exclusively" in its decision making.

Although Kirkman may be unhappy with the trial court's determination, it was not unreasonable in light of the evidence. First, there is evidence that Johnson, Ford, Kirkman, Cal, and Ray Longstreet were all gang members. Both Johnson and Herron were members of the Insane Vice Lords. R. 46-37 at 50. Kirkman lived down the block

and was known to Johnson as a Conservative Vice Lord. *Id*.; *see also* R. 46-38 at 158. Ray Longstreet was a "very high ranking" Vice Lord who had the authority to tell Johnson what to do until Johnson "retired" from the gang sometime earlier. R. 46-38 at 159-60. Even if the trial court had allowed in the evidence that Kirkman was merely a "neutron," it would have had to weigh that evidence with the evidence in Johnson's affidavit and his testimony that Kirkman was affiliated with a gang. It was not unreasonable for the state court judge to believe that Johnson's gang alliances motivated him to recant.

The Court also disagrees with Kirkman's argument that the state courts' decisions were made solely because of the gang evidence. The state court listed a number of inconsistencies in Johnson's various testimonies to find his recantation was "internally inconsistent and implausible." R. 46-38 at 367. The court also found that Johnson's original identification, which the court noted had a "dying declaration aspect" to it, was more reliable than Johnson's after-the-fact testimony. *Id*. at 368. The court then considered the motive behind Johnson's recantation, which it determined was driven by gang alliances. Finally, the court noted that the evidence at the scene of the murders was more consistent with Johnson's original testimony than his recantation. *Id*. at 370-71. The appellate court relied on these same determinations to affirm the trial court's finding. Johnson's gang affiliations were certainly a part of the courts' credibility determination, but by no means were they the exclusive factors.

In any event, the specific inconsistencies Kirkman points to between the record

evidence and the postconviction court's findings were not unreasonable. First, Kirkman argues that the state court's finding that Johnson recanted because of Ray Longstreet's call was unreasonable because, in fact, it was Kirkman's investigator who approached Johnson. The Court does not find this distinction relevant. While Kirkman's investigator may have approached Johnson, it is clear from the record that Johnson would not have recanted had it not been for his phone call with Longstreet, who promised Johnson that he would be protected if he came forward. Johnson's recantation would have seemed even more incredible had he decided to recant solely because an investigator approached him years after the trial.

Next, Kirkman contends that the state court erred when it concluded that the phone call with Ray Longstreet was made because of Johnson's "alliance and loyalty" with the Vice Lords. Kirkman points to Johnson's testimony that Longstreet told him to "tell the honest to God truth" as evidence that Johnson came forward for justice's sake. The appellate court rejected that argument, finding that the "circuit court's conclusion was not unfounded given Johnson's testimony and the fact that he, the defendant, Cal and Longstreet were all members of the Vice Lord gang family and Ford was a member of a rival gang." *People v. Kirkman*, 2013 IL App (1st) 112362-U, ¶ 20. As noted above, the state court's determination was not unreasonable given evidence of the parties' gang affiliations. The Court cannot conclude that the state court's decision to accept one set of facts (that Johnson's decision was motivated by gang affiliation) over another (that it was motivated by the truth) is against the clear and convincing weight of evidence when both are supported by evidence. *See Morgan*,

662 F.3d at 799.

Third, Kirkman argues that there was no evidence that he was involved in any gang. As the Court has already stated, there was evidence that Kirkman was affiliated with a gang—namely, Johnson's affidavit and hearing testimony where he testified that at the time of the shooting, Kirkman was a Conservative Vice Lord, Johnson and Herron were affiliated with the Insane Vice Lords, and Ford was a high-ranking member of the rival Gangster Disciples. R. 46-37 at 50; R. 46-38 at 158-60. Again, the state court's decision is not objectively unreasonable simply because there is room for difference of opinion. It is only objectively unreasonable if the decision falls "well outside the boundaries of permissible differences of opinion." *Morgan*, 662 F.3d at 800.

Finally, Kirkman takes issue with the state court's finding that Johnson's recantation was not done through a "desire to see that the criminal justice system is done," and tell the truth. The state court's inference that Johnson was acting in the interest of the Vice Lords rather than merely for justice's sake is not against the clear and convincing weight of the evidence. Johnson did not come forward with his new version of the truth until more than 15 years after the original trial and did so only after speaking with Longstreet. The Court also notes that Johnson's recantation is properly subject to scrutiny. *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) ("Disbelief of recantations is sensible."). His recantation is especially "suspect" because it was "produced . . . at the 11th hour with no reasonable explanation for the . . . delay." *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring).

On the overall record,[2] it was not objectively unreasonable for the state court to conclude that Johnson's recantation was incredible.

### 2. Inherently Unreliable Testimony

Kirkman also argues that even if Johnson's original testimony was true, Johnson has proven himself to be an unreliable witness. Because Johnson was the sole eyewitness at trial, Kirkman argues, his conviction based on that unreliable testimony violates due process under *Jackson v. Virginia*, 443 U.S. 307 (1979), entitling him to a new trial. The Supreme Court in *Jackson* held that a federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt. Kirkman uses *Jackson* to argue that Johnson's inherently unreliable testimony alone cannot be sufficient to convict Kirkman.

Preliminarily, the parties dispute whether this argument is procedurally defaulted. Kirkman did not raise it before the state trial court. Instead, the only claim Kirkman raised at that level was that he was entitled to post-conviction relief because he was actually innocent based on the newly discovered evidence of Johnson's recantation. *See* R. 46-37. The trial court rejected that argument after finding Johnson's recantation to be incredible. Kirkman then appealed, arguing for the first

_____

[2] The Court's general review of the state court record indicates the decision was not unreasonable. To list just one example, Kirkman had a motive to shoot Johnson and the others, as Johnson himself testified at the postconviction hearing—Kirkman likely was angry about Johnson's robbery of his crack cocaine before the shooting. *See* R. 46-38 at 120 ("I walked right up and grabbed the magnet and walked away." . . . Q. "You think he was happy about that when you took his drugs?" A. "I wouldn't be." Q. "Do you think he was angry about that?" A. "I would be.").

time that he was entitled to a new trial because of Johnson's recantation, regardless of whether the recantation or the original testimony was true. *See* R. 46-39 at 70. He argued that under *Jackson*, convictions based on unreliable or insufficient evidence violate the due process clause. *Id.*

The appellate court rejected that argument, stating that it assumed that "Johnson's original trial testimony was perjured, and his recantation is honest. The circuit court rejected that assumption, and we have determined that its conclusion was not manifestly erroneous." *People v. Kirkman*, 2013 IL App (1st) 112362-U, ¶ 23. Because the appellate court reached the issue, the Court finds it was not procedurally defaulted. *See Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009) (where the last state court to consider the issue does not rely on a procedural bar, but instead addresses it on the merits, there is no procedural default.).[3]

Turning now to Kirkman's claim, the state court's holding here was not unreasonable. Because the trial court held that Johnson's original testimony was more persuasive than his recantation, Kirkman was not denied due process during the trial based on that testimony. That Johnson is simply an "inherently unreliable"

---

[3] Even if the Court found that the claim was procedurally defaulted, it would still address it because it finds that Kirkman meets the actual innocence gateway standard established by the Supreme Court in *Schlup v. Delo*, 513 U.S. 830 (1995). That standard applies when a claim is procedurally defaulted, but the petitioner can show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence of his innocence. *See Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018). Here, without Johnson's testimony, which was the sole eyewitness testimony attributing the murders to Kirkman, it is more likely than not that Kirkman would not have been convicted. For this reason, Kirkman's procedurally defaulted claims can be considered under the *Schlup* standard.

witness does not entitle Kirkman to a new trial. Claims of insufficient evidence under *Jackson* are limited to record evidence, and do not include newly discovered evidence. *Herrera*, 506 U.S. at 402. Further, the *Jackson* inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Id.* (emphasis in original). At the time of the trial, no one involved in Kirkman's conviction knew that Johnson's testimony was unreliable. Johnson's supposed unreliability does not make the factfinder's decision to convict based on the evidence before it at the time of the trial irrational.

At bottom, Kirkman's claims are themselves inherently contradictory. Kirkman asks the Court to believe a witness that lied during the original trial but has since proven himself to be reliable in his recantation only to turn around and argue that Johnson is "inherently unreliable" because he lied during at least one of the proceedings in Kirkman's case. In either scenario, Kirkman argues he is entitled to a new trial. Kirkman cannot have it both ways. Johnson's recantation alone does not entitle him to a new trial. Rather, it entitles Kirkman to an evidentiary hearing to determine whether Johnson's original testimony or his recantation is more believable. The state court held that hearing and determined the original testimony was more believable. Without a finding that the state court's decision was based on an unreasonable determination of the facts, Kirkman is not entitled to habeas relief.

## B.    Actual Innocence

Finally, Kirkman argues he has a freestanding actual innocence claim, relying on similar principles found at the state court level. The problem with this argument

is that a claim of innocence, by itself, is not sufficient to warrant habeas relief. *See Herrera*, 506 U.S. at 400 ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* at 400. "The Court in *Herrera* assumed without deciding that the Eighth Amendment precludes the execution of a person who has demonstrated his actual innocence." *Arnold v. Dittmann,* 901 F.3d 830, 837 (7th Cir. 2018). "But neither the Supreme Court nor the Seventh Circuit has yet indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-capital case." *Id.* (citing *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.")); *Tabb,* 855 F.3d at 764 (describing issue as "open to debate" and collecting Supreme Court statements to that effect). Indeed, the Seventh Circuit recently characterized as "doubtful" the notion that such a claim could support relief on collateral review of a conviction. *Arnold*, 901 F.3d at 837. Kirkman's argument here asks this Court to correct an error of fact committed during his trial, which the Court cannot do without a showing of a constitutional violation.

If the federal courts do recognize freestanding constitutional claims of actual innocence, however, it is clear that evidence of innocence will need to meet an "extraordinarily high" threshold. *Herrera*, 506 U.S. at 392, 417. Because the Court is

skeptical of recanted testimony submitted years after the trial, *see supra*, Kirkman's claim does not meet this threshold.

Kirkman also argues that federal courts should recognize freestanding actual innocence claims like state courts do. But Kirkman has already had the opportunity to present an actual innocence claim in the state court. In fact, the state court diligently and deliberately considered his arguments and held an evidentiary hearing, but did not rule in his favor. The state appellate court likewise considered his arguments but affirmed the lower court. Kirkman has been granted opportunities to make his case. Kirkman simply has not been able to show that his conviction violated the Constitution to warrant habeas relief here.

### C.    Certificate of Appealability

The Court will, however, grant Kirkman a certificate of appealability. A certificate of appealability is warranted when a petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C § 2253(c)(2), or, similarly, when "jurists of reason would find it debatable whether the petition states a valid claim." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Seventh Circuit has explained that "[m]any prisoners who seem likely to lose in the court of appeals nonetheless are entitled to certificates of appealability under the statutory standard; meritorious appeals are a subset of those in which a certificate should issue." *Thomas v. United States*, 328 F.3d 305, 308 (7th Cir. 2003). Therefore, a COA "requires an overview of the claims in the habeas petition and a general assessment of their merits," and that the "resolution was debatable amongst jurists of reason" as opposed to a "showing that the appeal will succeed." *Miller-El v. Cockrell*, 537 U.S. 322, 336-

37 (2003). The Court finds Kirkman meets this standard.

## Conclusion

For the foregoing reasons, the Court denies Kirkman's petition for habeas corpus [1], but grants Kirkman a certificate of appealability.

ENTERED:

Dated: April 11, 2019

Honorable Thomas M. Durkin
United States District Judge